**Charles E. WHITTLE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 85–2043.**

United States District Court, District of Columbia.

April 30, 1987.

who is a beneficiary.

Brian C. Shevlin, Shevlin, Artz & Curtis, P.C., Arlington, Va., for plaintiff.

Mark E. Nagle, Asst. U.S. Atty., Joseph E. Digenova, Royce C. Lamberth, Charles F. Flynn, Asst. U.S. Atty., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

This is an action under the Federal Tort Claims Act, charging medical malpractice on the part of physicians at the Walter Reed Army Medical Center, which plaintiff claims resulted in the death of his wife, Joan A. Whittle. A non-jury trial was held on October 27 through 30, 1986.

Pursuant to Federal Rules of Civil Procedure 52(a), the court enters the following Findings of Fact and Conclusions of law.

## FINDINGS OF FACT

1. Plaintiff's wife went to Walter Reed Army Medical Center (Walter Reed) in August, 1981, for treatment of depression and chronic headaches. She had been troubled for many years by serious headaches and had sought treatment from a number of military and civilian facilities close to the Army posts where her husband was assigned. She brought with her the medical records of her treatment from at least some of these facilities. All previous efforts to determine the source of her pain and to relieve her symptoms were largely unsuccessful. It is clear from the records that Mrs. Whittle's problems were complex and of long duration. Hers was not a routine case.

2. Upon arrival at Walter Reed, she was first examined at the neurology clinic, which revealed no physical bases for her distress. She was then referred to the outpatient psychiatric clinic, where she came to be treated by Antonio Blanco, M.D., a second year resident in psychiatry. Dr. Blanco, 32 years old, had received his medical degree from the University of Madrid, Spain.

3. Dr. Blanco reviewed her history at the first meeting on August 13, 1981 and diagnosed her to be suffering from dysthymic disorder or atypical depression, hystrionic personality with obsessive traits, and possible authentic migraine headaches aggravating emotional illness. He prescribed Nardil and Norgesic, an analgesic.

4. On September 2, 1981, Mrs. Whittle again saw Dr. Blanco who prescribed a drug regimen of 75 mg. per day (5 tablets) of Nardil, an anti-depressant monoamine oxidase inhibitor (MAOI) which improves the psychological condition and acts as a mood elevator. Dr. Blanco also prescribed up to six tablets per day of Fiorinal, a barbiturate consisting of butalbital, caffeine and aspirin. The maximum recommended dosage of Nardil was 75—90 mg. per day. *See* Modern Drug Encyclopedia, 636 (13th ed. 1975) (75 mg. per day); *Physician's Desk Reference (PDR)*, 1981 ed. at 1375 (90 mg. per day). The maximum recommended dosage of Fiorinol was six tablets per day. *PDR* at 1574. On occasion, physicians prescribe dosages in excess of the recommended dosages.

5. There is substantial documentary evidence, which is largely undisputed, that warn of the prolongation and/or potentiation of the effects of barbiturates when used in combination with MAOI's. *See e.g., PDR*, 1981 ed.; Goodman & Gilman, The Pharmacological Basis of Therapeutics, 6th Ed., 1980. This is because the MAOI interferes with the ability of the liver to metabolize barbituates, allowing the barbituates to remain in the blood stream at higher levels for a longer period of time. As a result of this "prolongation" effect, taking Nardil in combination with a barbituate such as Fiorinal increases the possibility that a second, supplemental ingestion of Fiorinal will push the barbituate level in the blood to toxic levels. The MAOI can convert the non-toxic Fiorinal regimen into a potentially toxic one. Because of the "prolongation" or "potentiation" effect, the pharmacological literature recommends that barbituates should be administered at a reduced dose when taken concurrently with Nardil. *See e.g., PDR* at 1375. Even defendant's psychiatric expert admitted that these

drugs should be used cautiously and that he himself never used Nardil and Fiorinal in combination. Defendant's expert witnesses do not dispute this well known and adverse relationship.

6. Dr. Blanco's office chart and memorandum (Pltf. Exs. 6, 7 and 18) reflect his knowledge and concern about the potential, adverse interactions of the two drugs. Dr. Blanco testified that it was his intention, as approved by his supervisors, that the Fiorinal would be discontinued when Nardil reached its proper therapeutic level. None of these supervisors, with exception of Dr. Donley, was identified by name, and none testified.

7. Mrs. Whittle saw Dr. Blanco on October 2, 16 and 28 and November 13 and December 2, 1981 and on one other occasion, the date of which is not noted in the medical record. She saw him a total of eight times over a period of more than 3½ months. On some of these occasions, Mrs. Whittle reported her condition as improved and that she was feeling better. During this period, Mrs. Whittle was continued on the same regimen of Nardil and the maximum recommended dosage of Fiorinal (up to 6 tablets per day). Specifically, she was given 30 pills of Fiorinal on October 28, 180 pills on November 13 and 120 pills on December 2. Although Mrs. Whittle initially took Nardil less frequently than prescribed in order to avoid adverse side effects, during this period, at the urging of plaintiff and Dr. Blanco she took Nardil more regularly, as prescribed, despite the unpleasant side effects she had experienced. (R. at 49, 77).

8. Mrs. Whittle's informed consent as to the course of treatment prescribed by Dr. Blanco was not obtained on September 2, when the regimen of Nardil and Fiorinal was first prescribed. Dr. Blanco testified that he and Mrs. Whittle had had such a discussion, but the chart for September 2 indicates only that Dr. Blanco warned of possible abuse of analgesics. The chart of the same date does not list any discussion about the the interaction of Nardil and Fiorinal. In addition, the medical record shows that Mrs. Whittle signed a "Patients

Rights" form on December 2, 1981, three days before her death and three months after the original prescription for the combined use of Nardil and Fiorinal. This form stated that each patient over the age of 12 "shall be informed of ... the risks, side effects, and benefits of all medications and treatment procedures used, especially when the medications and treatment procedures are unusual or experimental." Patients Rights ¶ 4(e), in Pltf Ex. 6. The form also provides that the patient must give written, dated, and signed informed consent to "the utilization of any unusual medication or hazardous assessment or treatment procedure." *Id.* at ¶ 5(e). The Patients Rights form, however, only purports to be a recitation of rights. It does not purport to list the "risks, side effects, and benefits of all medications and treatment procedures" nor does it purport to be a written, informed consent to any course of treatment. The treatment chart for the December 2 visit does not reflect any supplemental discussion of treatment risks between Dr. Blanco and Mrs. Whittle. Furthermore, the plaintiff testified that his wife never passed on to him any knowledge on her part of the risks associated with the use of these drugs. In the complete absence of corroborating evidence, we cannot accept Dr. Blanco's contention that plaintiff and his wife were informed of the potential for central nervous system depression and barbiturate toxicity.

9. Mrs. Whittle had suffered headaches on December 2, 3, 4 and 5 and had taken Fiorinal each day for relief. On December 5, shortly after 10:00 p.m., plaintiff found his wife on the floor of their bedroom unconscious and unresponsive to efforts to resuscitate her. He never observed any indications of life from the time he discovered her. Previously, she had spent most of the afternoon of December 5 in bed. She was also nauseated and incoherent. In the early evening, perhaps around 6:30 p.m., plaintiff helped her get out of bed and took her downstairs for a short period of time. She appeared groggy and sluggish and required plaintiff's help in negotiating the stairs. After 45 minutes, plaintiff helped her back upstairs and into bed. He

checked on her two or three times during the evening, the last time being between 9:00 p.m. and 9:30 p.m. before finding her unconscious on the floor. When plaintiff's efforts to revive his wife failed, plaintiff called the rescue squad, which responded in 10—20 minutes and transported Mrs. Whittle to the Prince William Hospital, Manassas, Virginia, where she was pronounced dead at 11:41 p.m.

10. On December 7, an autopsy was performed by James C. Beyer, M.D. (Medical Examiner, Northern Virginia). The autopsy showed no gross or microscopic abnormalities sufficient to establish a cause of death.

11. The toxicology report found elevated levels of butalbital in the blood, liver and gastric contents. Death was listed as butalbital poisoning. All of plaintiff's experts were of the opinion that Mrs. Whittle died of butalbital intoxication. Such intoxication is a respiratory depression which acts on the respiratory center of the brain, impairing the ability to breath. While defendant's experts do not agree with this finding, they admit that the level of butalbital in Mrs. Whittle's blood was within the known toxic limits. There is no indication and defendant does not claim that Mrs. Whittle's death was due to an intentional overdose on her part. One of defendant's experts, a pathologist, who examined tissue slides prepared by the Medical Examiner, found early ischemic heart disease, which is consistent with findings of a death caused by myocardial infarction or heart attack. Defendant does not assert that Mrs. Whittle did, in fact, suffer a heart attack. It is defendant's basic position that the cause of Mrs. Whittle's death was "undetermined."

12. At the time of her death, Mrs. Whittle was a 36–year-old mother of three. She and plaintiff had been married 14 years and had moved nine times due to the requirements of plaintiff's military duties. In addition to her activities as the wife of a career army officer and mother, she had, at various times, taught special education, run a clothing boutique, published poetry, designed and sold silk flower arrangements and contracted to do interior decoration and design. She and her husband moved to the metropolitan D.C. area in June, 1981 with a substantial inventory of furniture and interior design equipment pursuant to Mrs. Whittle's intent to establish her interior design business.

13. The expenses of her funeral and burial amounted to $3,128.40.

14. Plaintiff presented an expert economist who testified as to the following two categories of damages: (1) those recoverable under the Wrongful Death Act—additional financial support, gifts and other contributions which plaintiff and next of kin could have expected to receive from the deceased except for her wrongful death plus the reasonable value of services which she would have provided them and (2) those recoverable by her estate under the Survival Statute for additional amounts which the deceased would have accumulated over her expected remaining lifetime.

Among the major assumptions made by the expert were:

(a) Plaintiff and Mrs. Whittle would live to their statistically expected life expectancies;

(b) Mrs. Whittle would work for 20.2 years more, her statistically expected work life;

(c) Mrs. Whittle would have earnings commensurate with her education and experience as a special education teacher;

(d) Plaintiff would serve to the conclusion of 30 years of service in the Army and would earn the pay of a Colonel, pay grade 0–6;

(e) The children would reside in the family home through the age of 18;

(f) Mrs. Whittle would provide household services commensurate with her age, work status and household composition;

(g) The Whittle family's expenditures would parallel those of families of similar income and composition, and

(h) The future rates of inflation, productivity and returns on investments on high grade municipal bonds and corporate AAA rated bonds would equal their compound

rates over the 25 year period from 1960 to 1985.

15. Based on the foregoing assumptions, the expert testified that plaintiff and his three children had incurred economic losses under the Wrongful Death Act of $512,171 and her estate's economic losses under the Survival Statute of $48,280 or a total economic loss of $560,451. Except for defendant's brief cross-examination, this submission has not been controverted.

## CONCLUSIONS OF LAW

1. This court has jurisdiction by virtue of the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671(b), *et seq.*, and 28 U.S.C. § 1346, *et seq.* Plaintiff's claim was presented to Walter Reed Hospital through the office of the Judge Advocate, Washington, D.C. on November 30, 1983 and denied on December 26, 1984. Plaintiff has exhausted his administrative remedies. Suit was timely filed within six months of said denial.

2. The defendant and its physicians/agents owed Joan Whittle the duty to provide medical and psychiatric care which conformed to the standards of reasonably prudent physicians in similar specialties. It is a national standard under which the care must comport with the degree of care reasonably expected of other professionals throughout the United States with similar skills and training, acting under similar circumstances.

3. The burden is on the plaintiff to prove by a preponderance of the evidence that it was more likely so than not that defendant in its treatment of Mrs. Whittle during the period of August 13, 1981 to December 5, 1981, failed to follow accepted medical practice and that said failure resulted in her death.

4. The medical literature and the expert testimony are uniform in warning of the dangers associated with prescribing MAO inhibitors in combination with barbiturates. With the exception of Dr. Miller, defendant's psychiatric expert, the thrust of the expert testimony was that such drugs must be used with great caution, in lower doses, or if possible not at all. Dr. Blanco testi-fied that he and the team of supervisors to which he reported were aware of the risks and warnings associated with the combined use of these drugs. According to a notation on his office chart, he planned to withdraw the patient from Nardil when she showed relief from her depression due to the therapeutic level of Nardil. He also testified that he was so directed by his supervisors. Although Mrs. Whittle reported that she was feeling improved, Dr. Blanco disagreed with her subjective responses and made no change in the dosages prescribed.

5. By continuing to prescribe large volumes of Fiorinol to Mrs. Whittle at a time when she was also taking the MAOI Nardil, and by failing to take any steps to reduce or to monitor Mrs. Whittle's usage of Fiorinol at a time when she was taking a maximum or near maximum daily dose of Nardil, Dr. Blanco displayed a cavalier approach to Mrs. Whittle's treatment. Such conduct was not consistent with the warnings in the medical literature that Nardil and Fiorinal only be used together with great caution, if at all. By so acting, Dr. Blanco breached his standard of care to Mrs. Whittle.

6. In addition, it is well-settled that a physician has the duty of warning his patient of all material risks associated with a proposed treatment and of the available alternatives. From September 2, 1981 until December 5, 1981, Mrs. Whittle was prescribed the maximum daily recommended amount of Fiorinal (6 tablets per day), along with an amount of Nardil (75 mg. per day) approaching the recommended maximum dosage for that drug as well. While it appears that Dr. Blanco, on September 2, 1981, warned her about the possible abuse stemming from the use of analgesics, there is no evidence that he gave her any warnings about Nardil and Fiorinal. In fact, it was not until December 2, that she signed the "Patients Rights" form acknowledging her right to an explanation of the "risks, side effects and benefits of all medications and treatment procedures used." This was three days before her death and three months from the time when the combined

use of Nardil and Fiorinal was first prescribed. By failing to give Mrs. Whittle an explanation of the potential risks and benefits of the proposed course of treatment, Dr. Blanco also breached his duty to obtain informed consent.

7. The weight of the evidence shows, as supported by the medical examiner, that Mrs. Whittle died as the result of butalbital poisoning caused by the ingestion of Fiorinal.

8. Dr. Blanco's breach of the applicable standard of due care and failure to follow accepted medical practice was the direct and proximate cause of Mrs. Whittle's death by butalbital poisoning. In addition, Mrs. Whittle's death by butalbital poisoning is the direct and proximate result of a course of treatment for which Dr. Blanco failed to obtain informed consent.

9. Compensible damages for which defendant is liable to the beneficiaries of Mrs. Whittle under the Wrongful Death Act and to her estate under the Survival Statute have been proved by competent evidence to total $560,451.00.

10. Plaintiff shall be awarded judgment in said amount.

An order consistent with the foregoing has been entered this day.